Good morning, Your Honors. I'm David Reed. I represent Joseph Ferguson. And I would like to speak briefly about the Sixth Amendment violation that we contend occurred. Mr. Deitch has joined in that, and he will also speak briefly about it. And then, of course, I'll move on to my other issues in my brief. And then Mr. Deitch will make his arguments, with your permission. So roughly speaking, how much time do you want and how much time does he want? I'm not going to spend that much time, Your Honor, no more than 10 minutes. Your Honor, as the Court knows by studying the record, that the key witnesses against Joseph Ferguson in our trial was Mr. Paul Amaris, Gabe Loaiza, and Oscar Moon, who I lovingly referred to in my brief as members of the murder gang. These were the individuals who committed a rather brutal murder of a helpless person who was trapped in his car. And you have, I'm sure, studied the record and saw how brutal that particular murder was. Demonstrating the murder gang's credibility at the trial for me was central to Mr. Ferguson's defense. The District Court found that it was reasonable for these witnesses who committed the murder to hope or even believe that their cooperation, assistance, and testimony in the case would be viewed favorably by local law enforcement officials who were taking a wait-and-see approach to whether they would proceed on the murder case. Now, we contend that the full disclosure of those particular facts on cross-examination were central to show the personal stake that these particular witnesses had to please the government, and particularly the DA's office, and would reveal the nature and quality of their motives and biases against the Ferguson brothers. How far do you have to go into the facts of the murder, though, to bring out the fact that they are suspects and that they hope that somebody will take their testimony into account? Well, we contend, Your Honor, that in order to show a person's true bias and credibility, the more horrendous the type of murder is, the more they have to benefit by pleasing the government. You can't have one without the other. But wasn't the potential punishment for that crime explored in the cross-examination? The court found that this particular murder, the facts were that, and he had tremendous state court trial experience, I might add, would not rise to the level of a life without parole or a death penalty case. And therefore, it would have been first degree, but it would have been not one with special circumstances or any of these enhancements that implicate life without parole. And he indicated in his order that we could cross-examine to show that these were suspects, suspects only, who were facing an investigation in a case involving a murder in which first degree murder was on the table. But we contend that that's not sufficient. We contend that it's the jury has the right to see how horrendous the particular facts of the murder was in order to see what they had to gain from local law enforcement authorities by testifying favorably for the government. We were not allowed to elicit any of the facts of that murder. Obviously, we stuck with the court's ruling. And we would therefore contend that that was a Sixth Amendment violation. And obviously, it's going to be a judgment call for the judge at this time to figure out how much to let in, both in terms of how horrendous the crime was and, indeed, how strong the evidence against these three men was. I mean, if the evidence was pretty slender, well, they got less to gain. If the evidence was really strong, then they got more to gain and so on. So it's going to be a judgment call. And we review that abuse of discretion. Is that what our role is with respect to what the district judge did here? I would think so, Your Honor. That's the standard, I would think. I'm afraid that is the standard, which is what gives me trouble with this, because I'm not sure I would have done exactly the same thing. Maybe I would have let more come in, because your point is a valid one. I mean, the worse the crime and the stronger the evidence, the more you have an incentive to try and get a deal, of course. I'll move on to my other points, Your Honor, and I'll let Mr. Dykes cover any other additional argument on the Sixth Amendment violation. But as the Court knows, the Court didn't give a roll decrease to Mr. Joseph Ferguson for the marijuana offense, and he gave him a gun enhancement on that particular crime. Now, he was on the periphery of that particular offense. He came in at the point in time when marijuana had already been taken out of the garage. He showed up during the point in time when these other individuals were loading the marijuana into Mr. Moon's car. And yes, he allowed his residence, his garage, to be used to repackage the marijuana. I know the government made a big deal of that in its brief and in district court. But to me, that invokes visions of employees who are working for narcotic conspiracies, who are in these little rooms packaging heroin into balloons. They don't have any equity interest in the operation. They don't control where the stuff goes. They don't make any money. They don't profit from anything. They don't bring the drugs into the facility where they're packaging the balloons. We give those people minor roll decreases. Here in Mr. Ferguson's situation, he allowed his place to be used to repackage the marijuana. Then he jumped into the car and went with his brother out to the goat pen where the marijuana was loaded into the goat pen. Had no equity interest. All he did was ride with his brother, William, out to the goat pen. We would contend that it was abuse of discretion for the court not to give a minor roll decrease. And the court abused its discretion in giving Mr. Joseph Ferguson a gun enhancement. There was no evidence that he carried a gun. Going back to that scenario where these people are packaging heroin into balloons in some back room, if the leaders come in and they're flanked by bodyguards that are carrying guns, and the leader's carrying a gun, he's telling the people, hurry up, you're not packaging this stuff quick enough. Isn't the test whether it's reasonably foreseeable that he would have known that others used guns as part of the overall conspiracy? Well, that perhaps might be the issue, Your Honor. But we think that in this particular case, it was an abuse of discretion to give that gun enhancement to the guy who was just tagging along with his brother and shouldn't have been given. Obviously, if the roll decrease and the gun enhancement were given inappropriately, incorrectly, that would have been an error, obviously, in the final guideline calculation. And then the court would have to remand it back to the district court for resentencing if inappropriate guidelines were used. Now, if the court finds that the guidelines were appropriate, that they were appropriately applied, we still argue, and that's our third claim, or last claim should be the fourth claim, I should say, is that it was unreasonable to give Mr. Joseph Ferguson such a lengthy sentence for showing up on a few occasions where these other members of the conspiracy were doing these crimes. He never entered any homes. He was, according to the testimony at trial, a lookout. He had all these mitigating factors going for him. And we think that the court placed undue emphasis on the nature of this particular crime, the heinousness of it. Did the court fail to consider any of those factors that you just mentioned? I don't recall at this time, Your Honor, I'd have to review the record of sentencing, whether he made articulable facts that he's taking them into consideration. Maybe the government would be able to answer that question. But we certainly outlined all those in the briefing during sentencing. We pointed those out during sentencing. I know I did that. But it seemed as though the court was focused, was fixated on the heinousness of the crime, and he took it out on Joseph Ferguson. And I would submit. Okay. Thank you. Good morning, Your Honor. I'm Philip Dutch, and I represent Mr. William Ferguson. First of all, on the Eighth Amendment argument, I'll indicate to the court that I don't, unless the court has questions, I don't intend to pursue that issue further. I do see the precedents that are not good against this defendant. And basically, I take the same position as Mr. Justice Reinhart did in Hungerford, which is essentially this is cruel, this is unusual, but there's nothing I can do about it. The decisions in this circuit essentially indicate that the consecutive mandatory 924s are valid. Well, it's not just this circuit. It's the one. It's not just this circuit. It's the one's oars. I recognize that, but instinctually, when I looked at the sentence in this case, it just still seems to me to be cruel and unusual. There's not a whole lot I can do about it. I do want to address one particular facet of the argument that Mr. Reid just made, and that is, as we know, in the Ferguson, in Mr. William Ferguson's case, the brunt of the sentencing occurred because of the consecutive 924s. The consecutive 924s were based upon the testimony by the three gentlemen that Mr. Reid was talking about, particularly Mr. Palomari's. Essentially, that testimony during the trial was that they entered these locations with a uniform and a gun and a badge. Based on that testimony, the jury was supposed to determine that a 924 occurred. Well, there were 11 different incidents that were charged against Mr. William Ferguson, including 11, if I remember correctly, 11 924s, the jury found four. Essentially, they determined that the evidence that had been presented on the 924s, presented through the mouths of those three witnesses, were not sufficient to justify a 924 conviction. Essentially, the jury was open to listen to whether or not the testimony of the three government witnesses that we're talking about was probative on that issue. That's essentially where I come in with regard to what Mr. Reid indicated. I believe we were entitled to cross-examine the witnesses regarding the circumstances of the offense. One of them was a police officer, the others were police officer wannabes. They know the benefit of cooperation, and they would certainly know the benefit of what their cooperation could provide in the sense of... Let me go back. If the jury heard the facts of the case, they would recognize, the jury would recognize how substantial the concerns of these witnesses would be in the outcome of what would occur. And as police officers, they know the value of their cooperation. The jury not having been able to hear that, the jury was then in a position simply to accept the conclusions of those witnesses that they essentially weren't concerned about the outcome of the investigation. I think only Mr. Moon said that he hoped for some kind of a benefit, but ultimately the other two, Mr. Palomar and Mr. Loaiza, both indicated that they had no concerns whatsoever about that. I think had the jury been able to hear the facts to see what their substantial exposure was, and know of course their background as police officers, had they heard the facts, they would have known essentially that their conclusions about the fact that they were not concerned were a lie. And so therefore I think the defense could have established that when they testified to the jury that they had no concerns about the potential of what would occur, that the jury could well infer that they were lying in this very proceeding under oath. And I think that might very well have affected their credibility, particularly on the four instances in which they found a 924. They found a 924 in Count 5, Count 18, Count 28, Count 34. There were 11 924s. The others, they found no, they made no decisions. How would you have brought out the evidence that you wish you had been able to bring out, and how long would it have taken? I think it would have required calling Mr. Moon regarding his statement. I think at length it would have been a half a day. I think to the extent that Mr. Palomarza or Mr. Loaiza might have challenged that which Mr. Moon said, that would have required their testimony. I think we're dealing with half a day. I think no more than that. So in your view, a day? Not even that, but a day at most. No, I was adding your half a day and half a day. I think a half a day we would put Mr. Moon on the stand to testify as to what he saw. Presumably, or perhaps, Mr. Palomarza and Mr. Loaiza would have wanted to get on the stand and talk about what they claim happened, but I don't think there's any real dispute about what happened. So the likelihood of the potential that there would be some issue that would take up a lot of time. But as to the facts of the murder, my guess is that all three of them would have taken the fifth. As soon as you start saying, well, what did you do to the guy? I don't think they're going to tell you. They may not, but on the other hand, had they taken the fifth, there would be the potential that the defense could move to strike their direct testimony if their decision to take the fifth impacted any portion of that which they testified to. And I think we would have been dealing with a motion to strike their direct. So that's essentially the position that I think is relevant to Mr. William Ferguson. I think to the extent that the government relied on the fact, on the testimony of those witnesses, that they all came in with guns and badges, and the jury was not necessarily willing to believe that, because in five of the 924, they made no decision, they certainly were open to the potential challenge to the credibility of those witnesses. Had we been able to cross-examine them with regard to the facts, I think we could have established that they were lying in this very proceeding. And that would have potentially even knocked out some of at least three of the four instances in which they found consecutive 924s. I think one of them was a problem in the sense that there was some testimony about Mr. Ferguson putting a gun in the mouth of somebody that was on count number 18. But I think as far as the others, it was essentially without corroboration, and they had to rely on believing those three witnesses, and I think that's inappropriate. The witnesses had no agreement concerning their testimony in return for something relative to the murder case, correct? They had no agreement. But on the other hand, they're police officers, and they know the value themselves of what their cooperation would mean. And I think it's a reasonable inference to assume that as police officers or police officers want to be, they would know that their cooperation would have some impact as to whether or not they would in fact be charged with a murder case. In fact, in some of the kites that were exchanged, I think there was one kite I think was mentioned in the transcript. There was one kite in which Mr. Calamari wrote to Mr. Loiza in essence saying, remember, HP, Huntington Park, is out of bounds. We can't talk about it. So it's a, in my view, I think with regard to the four instances in which there were 924s found for Mr. Ferguson, I think it's a substantial issue. I want to briefly mention, and then I'll sit down, the contention by the government with regard to the issue of harmless error. The three factors involved in harmless error, of course, are the importance of the testimony. With regard to the issue that I'm raising, the testimony of those three witnesses was critical. It was not cumulative. And with regard, except for one instance, there does not seem to be any corroborating evidence on those 924s. As a consequence, I do not think it was harmless error. And I'm prepared to submit a charge. Okay. Then there's little time that both of you have saved. Okay. Let's hear from the government. Good morning. May it please the Court. I am Tova Calderon. I live in the United States. I'll address the confrontation clause argument first, I think, as my colleagues did. Your Honors, under this Court's well-settled authority, the defendants had no Sixth Amendment right to cross-examine the three government witnesses about the unrelated, uncharged homicide that they were allegedly involved in. And they were not allowed to go into those details beyond what the district court permitted. This Court considers three factors in evaluating confrontation clause claims like the ones that has been presented here. Can you keep your voice up, please? Oh, I'm so sorry. That's all right. Slow down. Speak louder. I'm sorry. I'm old and I'm deaf. That's okay. You run fine. I'm Tova Calderon. I was just saying that under this Court's well-settled authority, the defendants had no Sixth Amendment right to go into the details of the uncharged, unrelated homicide. I think the best case from this Court on that issue is United States v. Mitchell, which contains almost identical facts to the facts that we have here in this case. In there, the defendants sought to cross-examine a cooperating witness about his involvement in two unrelated homicides. It was actually a double homicide in that case. So to the extent you're concerned about how egregious the crime was, there are pretty egregious facts in that case as well. This Court held that it was proper to exclude questioning about the details of those homicides, so long as the defense was permitted to ask the witness what sort of benefit he believed or hoped he would receive in connection with that unrelated case for his testimony against Defendant Mitchell. And this Court made clear that the details of that unrelated crime were not relevant to the issue of bias. What was relevant was what the witness would gain or hoped to gain in exchange for his cooperation. That's all the jury needed to know to assess the reliability of that witness's testimony. And same here under Mitchell, the district courts... Yeah, but I'm not sure I can get to the point of abusive discretion, but I take the point that how much the witness might hope to gain may very well depend on not just that it's first-degree murder in the abstract, but there are ranges of first-degree murders, some of which will likely get a higher sentence than others. The degree of involvement and so on, if they're trying to get out from under something really bad, that's different. I don't think it's irrelevant. It may be that it's sufficiently tangential that the judge is not required to let it in. But to say it's irrelevant is a little strong for me. Let's assume it's relevant, then. I think I would like to point out that it's not a first-degree murder. It's a homicide investigation that's still unsolved at this point, and they haven't brought any charges in connection with it, so it's unclear whether it would be charged as first-degree murder. There could be a self-defense. Who knows? That was one of the reasons the district court found that it would just confuse the jury. But assuming it's relevant, let's just assume it's relevant. Under this Court's three-part test for evaluating confrontation clause claims, the district court still had broad discretion to exclude the evidence for the other reasons, and those other factors go to whether or not there were other interests that outweighed the defendant's interest in wanting to cross-examine those witnesses and whether the jury had enough other information to assess the witness's credibility. Again, even if the homicide details were relevant, the district court had other legitimate reasons for limiting cross-examination. He said this would have resulted in a mini-trial, and I think it probably would have taken at least a day, if not more, to go into who said what, who did what, who carried a gun, who carried a knife, how many times the person was stabbed. And this was an unrelated matter. How many days did the whole trial take? That's a good question. I believe I'm hearing theories from the table from the people who were actually at the trial. I believe it was at least a two-week trial, and it was a lengthy trial. We're talking about a 34-count indictment with upwards of 20, 30 witnesses and multiple defendants. So it was a very lengthy trial, and the district court found that it would have resulted in some sort of mini-trial on a collateral matter that didn't even involve the two defendants that were being prosecuted had they taken the opportunity to go into those details. I can see that. When you're a suspect in a murder investigation and then two of the three can say, well, I'm not concerned about that at all. You can see the point of wanting to get into at least some details about it, because it seems improbable that two people really aren't concerned with that investigation at all. But apparently that's what they testified. I'm sorry. That's what they testified. Apparently, when they asked, well, aren't you concerned about that? It doesn't, you know, aren't you hoping to get some benefit from this? Well, no, I'm not concerned about that investigation. Well, that's what they said, but I will point out that the district court assumed that it was reasonable for them to hope or expect that they would get some sort of benefit or leniency in connection with that prosecution. For that very reason, the district court did permit extensive cross-examination on that issue. They were allowed to ask the defendants were allowed to ask the witnesses about their status as suspects in the homicide investigation and ask them if they understood that that homicide investigation was still open, that they could possibly be charged with that crime, that they've known about that since the time they were arrested. They were allowed to be asked what hopes or beliefs they had regarding leniency from prosecution. They were allowed to be asked about the potential punishments that might have been imposed upon a murder conviction. And they were also allowed to ask the witness, Alvin Moon, whether or not he provided a statement to law enforcement about that homicide. So I think extensive cross-examination was permitted. And again, this goes to whether or not the defendant – well, going back to the two factors, we had other legitimate interests. One is that it would have resulted in a mini-trial, taking up a lot of time and confusing the jury on a collateral matter. Also, the district court pointed out, and this was confirmed by one of the witnesses' attorneys during the hearing, that they likely would have asserted their Fifth Amendment right against self-incrimination. So they probably would not have answered questions about that. But third, the third factor – Well, maybe I got something to worry about a lot stronger. Well, perhaps. I don't think I can say, as part of the same testimony, I'm not worried about it, and then say I take the Fifth. And have the jury say, I don't think he's worried about it. Well, I say, perhaps. I mean, that's possible. But just going to what – It certainly can have an impact on the jury, though, can't it? A witness taking a Fifth Amendment right? Well, going – well, certainly, I mean, I assume that's what their attorney would advise them to do. But in terms of the impact on the jury, the third factor in this analysis is whether the jury had enough information to assess the witness' credibility. And in this case, I mean, the amount of impeachment material in this case was really any defense attorney's dream. All three witnesses admitted in their testimonies that they committed horrible crimes in connection with this case, and also that they were caught in San Diego trying to sell cocaine to an undercover DEA agent. They all testified that they lied to investigators before eventually entering plea agreements, that they were facing life sentences in this case, and that they all hoped for big downward departures, that they hoped that the government would also move to reduce their sentences in the San Diego drug case. In addition, the lead witness, Ruben Palomares, he testified that as a police officer in the Rampart Division, he regularly fabricated evidence, falsified police reports, testified falsely in court, that as a result of his conduct as a police officer, many innocent people may have gone to jail. So I can't imagine a case with more impeachment material, and the defense spent quite a bit of time extensively cross-examining all three witnesses in this case. And I think that's certainly relevant, and that also goes to the harmless error analysis. You look at how much information the jury had and how much cross-examination was permitted to attack the credibility of the witnesses. So even assuming that some details regarding this alleged homicide were relevant, the district court certainly had broad discretion under this court's well-settled authority, not just under the Mitchell case, but under Beardsley and Larson and the other cases we have cited in our brief. I do want to go, as to the other corroborating evidence on the 924s, because I know that's a concern for Defendant William Ferguson, I went through my own witnesses, and almost every single witness, other than the three cooperating witnesses, testified that guns were used in this conspiracy. In fact, the whole point of the conspiracy was for police officers to get away with committing armed robberies by posing as police officers, and that required the use of guns. And I have a list of at least 15 other witnesses, four co-conspirators and 11 eyewitness victims who were victimized in these crimes who all testified that guns were present. So I don't think there's any question in this case that guns were present, and no one is challenging the sufficiency of the evidence on that matter. I will briefly address Joseph Ferguson's sentencing arguments, unless there are more questions about that Confrontation Clause issue. The district court in this case clearly found that, or found that the defendant, rather, did not satisfy his burden of showing that he was a minor participant in the William Street offense, which was the substantive drug count of which he was convicted. And it wasn't just repackaging that he was involved in. He volunteered a location that is his apartment for the intermediate delivery of drugs. He provided the materials for repackaging the drugs. He helped transport the drugs to the ranch. And once at the ranch, he participated in concealing the drugs and participated in conversations about how they were going to sell the drugs and split up the drugs. There was also testimony in the record, although the district court did not make this finding at the sentencing, there was also enough testimony in the record to indicate that he may have also been providing surveillance or serving as a lookout while his brother and Palomares and Moon were inside stealing the drugs. In fact, I think his, the district court found that he played a significant role based on all of these facts. And I think you could even argue he provided more assistance than Palomares because there was testimony in the record that Palomares, the so-called ringleader of the conspiracy, was recovering from shoulder surgery at the time and actually didn't partake in any of the heavy lifting or repackaging or hiding of the drugs. There were three instances that he was involved, that Joseph was involved in? Three incidents separate or? He was convicted of this one substantive drug offense which involved 900 pounds of marijuana. Right. The district court also found that as a member of the conspiracy during the whole entire previous year, he'd gotten involved in the conspiracy in October of the previous year of 1999 and this was in October of 2000, that he had participated in at least four other robberies involving drugs or attempt to steal drugs. That was other relevant conduct that was part of the district court's decision to use of guns. Because he was involved in the civil rights conspiracy and because he knew that the civil rights conspiracy obviously involved people dressing up as police officers to commit armed robbery and that he had been involved for an entire year, the district court found that that was sufficient to support a finding that he could reasonably foresee that guns would be used in the William Street offense. And, in fact, there's no question that guns were used in that offense. There's testimony from at least three other witnesses that guns were used. And so the issue is whether it was reasonably foreseeable, not whether or not guns were actually used. And on the reasonableness, well, this Court has said that a correctly calculated guideline sentence will normally not be found unreasonable on appeal. The district court in this case, I think, correctly calculated the guideline sentence and sentenced him to the lowest possible sentence within that applicable guideline range. There was extensive discussion about the 3553 factors at the sentencing hearing. With respect to the nature of the offense, the sentencing judge said, and I just want to quote briefly, in 34 years as a lawyer and 12 years as a judge, the testimony and evidence that I saw in this case was the most astonishing I've ever encountered. The idea that police officers would associate themselves together to commit home invasion robberies is shocking.  And I think it's important to note that the district court in this case did not take into account some of that guideline range, taking into account all the factors. For example, he did not impose a fine, and he recommended that the defendant be housed in a local facility so they could be near his family. He also gave him a lesser sentence than at least one other co-conspirator who had actually pled guilty and cooperated. I, at this point, don't really have anything further unless the Court has questions. Okay. Thank you. With respect, we ask that you affirm. Thank you. Thank you. Response. Ms. Calderon indicates that there were, she has a list of witnesses who testified with regard to the use of guns. On the five particular, on the four particular instances in which Mr. Ferguson was convicted, it's not totally clear that there were persons other than the three people that we're talking about that testified to the potential use of guns. I think there was one on Pearl Street. As regards to the others, it's certainly not clear. With regards to the issue of the fact that Ms. Calderon brought up, that credibility, there were a lot of points of credibility that could be used to attack these witnesses. To some extent, that was true. However, it was a theory of the government's case. They brought out all of the instances in which these witnesses lied in the past, how long they had lied, what they lied about. It was their theory and their presentation to the jury that they now had accepted responsibility for what they had done in the past, which included all of the lies, and now you can trust them because they've made this plea agreement, et cetera. Had they been sentenced on the plea agreement at the time of their testimony? Had they been sentenced on those convictions at the time of their testimony? They had been sentenced in San Diego but had not been sentenced in the Instant case. They had been sentenced to 15 years, I think, or two of them had been sentenced to 15 years. Mr. Moon had gotten 27 months in San Diego for what happened there but not in the Instant case. But they had the sentence hanging over their heads at the time they testified. They had, right. Yeah. So with regard to the issue of credibility, I think given their theory that basically these people have now rehabilitated, they've accepted responsibility for what they did, and now you can trust them, it therefore became the defense burden to essentially establish that you can't trust them anymore, and that's where we had hoped that we could examine them regarding the circumstances of the offense to establish that they were lying in this very case. So I think the one point that I'd like to make, and with that I'd be prepared to submit it, I think that the jury had a sense of the general incentive. From the questions that the court allowed, the jury certainly could have concluded that they had a general incentive to lie. I think the problem with regard to the fact that we could not cross-examine them is that the magnitude of the incentive was not clear to the jury without giving us an opportunity to cross-examine them. Okay. Thank both sides for their arguments. United States v. Ferguson and Ferguson now submitted for decision. That completes the argument calendar for this morning, and we're in recess. Thank you very much. All rise.
judges: Tunheim, Canby, Fletcher W.